Ray MARSHALL, Secretary of Labor, United States Department of Labor, Appellant,

v.

CANADA DRY BOTTLING COMPANY OF NASHVILLE, INC., and Robert N. Greene, Appellees.

No. 77–1088.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1978.

Decided Feb. 7, 1979.

Rehearing and Rehearing En Banc Denied June 4, 1979.

Carin Ann Clauss, Jacob I. Karro, Sol. of Labor, Sandy K. McCormack, U.S. Dept. of Labor, Washington, D.C., Marvin Tincher, Regional Atty., U.S. Dept. of Labor, Nashville, Tenn., John K. Light, Jr., Washington, D.C., for appellant.

F. Clay Bailey, Jr., Dearborn & Ewing, Nashville, Tenn., for appellees.

Before ENGEL, Circuit Judge, PECK, Senior Circuit Judge, and DeMASCIO, District Judge.*

PER CURIAM.

This action was brought by the Secretary of Labor under Section 17 of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) to enforce its discriminatory discharge provisions. The Secretary's complaint alleges that defendants violated Section 15(a)(3) of the Act by terminating the employment of Charles L. Smith because he had filed an action against them to recover overtime compensation under the Act, and the complaint prayed for an injunction against future violations as well as for Smith's reinstatement and back wages. In their answer, the defendants denied the charges and alleged that Smith had given two weeks notice of resignation. The Secretary perfected this appeal from an order of the district court dismissing the action on the ground that the plaintiff had failed to sustain the burden of proof.

On the day on which the two weeks notice was found by the district court to have been given, Smith went to appellee Robert N. Greene, president of appellee Canada Dry Bottling Company of Nashville, Inc., and complained about the fact that he was not being accorded treatment comparable to an employee of a related but separate bottling company who was doing similar work. According to Smith's testimony concerning this confrontation, he told Greene that he would have to be paid more money for fewer work hours. According to Greene, his demands were limited to those

* Honorable Robert E. DeMascio, United States District Court for the Eastern District of Michigan, sitting by designation.

concerning hours of work, and ended in Smith's giving two weeks notice. After a careful study of the record, we conclude that the district judge's findings of fact with reference to this conference and otherwise cannot be held to be clearly erroneous. Rule 52(a), FRCP; *Brennan v. Braswell Motor Freight Lines, Inc.*, 396 F.Supp. 704 (D.C.Tex.1975); *Mornford v. Andrews*, 151 F.2d 511 (5th Cir. 1945). At the conclusion of his painstaking Memorandum, District Judge L. Clure Morton made this statement:

> After viewing the witnesses and judging their credibility, the court finds that Charles L. Smith voluntarily resigned his position *and had done so prior to the filing of this suit to collect overtime compensation.* Plaintiff having failed to sustain the burden of proof, an appropriate order will be entered dismissing this cause. (Emphasis supplied.)

In view of the district court's clear and emphatic finding that Smith's resignation had been accomplished prior to the filing of the wage suit, such filing, and any other intervening factors which may have taken place during the period between the resignation and its effective date, is irrelevant. One such factor is that on the day following the filing of the lawsuit Smith and Greene had another discussion which ended in Greene's telling Smith that he could take his pay and leave, and in his handing Smith a discharge slip. With reference to this circumstance, in a finding supported by the record the district court found, "So that Smith could qualify for unemployment compensation, the termination slip reflected that he had been discharged."

The order of dismissal entered by the district court September 15, 1976, is affirmed.

ENGEL, Circuit Judge, dissenting.

I respectfully dissent. Giving full credence to the testimony of Robert N. Greene, president of the bottling company, and resolving all fact disputes and credibility issues against the claimant Charles L. Smith, the record still shows unmistakably that Smith was, in fact, discharged because he had filed suit for overtime compensation due him under the Fair Labor Standards Act. The undisputed facts, construed most favorably to the company, are that during the afternoon of Monday, July 28, 1975, Smith came to Greene with a complaint that he was being required to work too many hours and was dissatisfied, according to Greene. Smith testified, and the trial judge found, that Smith was also dissatisfied with the wages he was receiving. In any event, at that time, after conferring with Greene, Smith got up, started to leave the office and said, "I'm turning in my two weeks' notice" and walked out.

Although Smith denied it, there was ample evidence that he repeated the fact that he was quitting on several occasions to other employees. It is undisputed, however, that he continued working for the bottling company as before.

On August 4, 1975, while still working for the bottling company and before the two weeks had expired, Smith filed suit against Canada Dry and its owners Robert and Roy Greene for overtime compensation. Roy Greene learned of the lawsuit on August 6 by reading about it in a local newspaper and telephoned his brother Robert that same evening. The following morning, according to Robert Greene's testimony, he called Smith into his office. That Greene's action in accepting what he claimed was Smith's tendered resignation was directly the result of learning of the lawsuit is manifestly clear by his own testimony:

Q. Now, when did you—how did you find out that, and approximately when did you find out that Mr. Smith had filed the wage and hour action?

A. I don't know what date it was, Mr. Bailey, whatever day it was in the paper. My brother called me that night at home and told me. I never did—I did not see it myself; that's when I knew about it.

Q. All right, what—well, what happened when you got to work the next day?

A. I came to work the next morning and called Charlie in the office and talked to him. He—at times Mr. Smith gets rather upset about things, and I tried to talk to him about it, but I could realize right away that that would not work.

And he said, told me right away that he had been informed that he would not quit or anything, he would be fired.

I said, "That's not it. I accepted your resignation."

He said, "I can't work—I can't live without compensation."

And I said, "I can fix it where you can get workmen's—unemployment compensation", and I walked out of the office.

Q. And you fixed it where he did get unemployment compensation?

A. Yes, sir.

As can be seen from the foregoing testimony by Greene, it has to be apparent that, assuming Smith had tendered his resignation, Greene had not accepted it until that time. Greene admitted as much later in his testimony:

Q. All right, so then it's your testimony today that he gave you a two weeks' notice on Monday, July the 28th?

A. Yes, sir.

Q. All right, sir, and you accepted it, is that right, on the Thursday,—

A. Yes, sir.

Q. —August the 7th?

A. Yes, sir.

Q. That is the date that appears on the lay-off slip?

A. Yes, sir.

Q. All right, sir. So, in other words, the two weeks would have been up on Friday following?

A. You mean the next day?

Q. Yes, sir, the full two weeks.

A. Is that—those dates, I don't have any idea.

Q. So, you accepted it and got rid of him on the Thursday, however?

A. If that's the day, the way the days work out . . . .

Q. Then in other words, you did not accept the two weeks' notice on Monday that he gave it to you?

A. No, sir.

In my opinion the foregoing testimony leads irresistably to the conclusion that Greene "accepted" Smith's resignation on August 7 only after learning that Smith had filed suit and because of it. The balance of Greene's testimony corroborates this conclusion. At some time prior to the incident involved here, Smith had suffered a back injury. Notwithstanding Smith's resultant limited ability to work, Greene had kept him on the payroll at $170 a week. As Greene put it, Smith's initial complaint "came as an astonishment to me, because the previous three months I had paid Mr. Smith to virtually do nothing other than check the salesmen and things like that." Greene's disgruntlement was particularly acute because, out of sympathy for Smith's large family, he had kept him on even though Greene himself had a son out of college who needed a job. Greene's reaction in calling Smith into his office immediately after learning of the lawsuit and of "accepting" his resignation on the spot is a completely human and understandable reaction in an employer who conceived his own loyalty to have been repaid by ingratitude. It is not, however, a reaction permitted by the Fair Labor Standards Act. Section 15(a)(3) of the Act, 29 U.S.C. § 215(a)(3), makes it unlawful for any person "to discharge *or in any other manner discriminate against* any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." (Emphasis added).

To the extent that the trial judge's findings are to the contrary, I would hold them clearly erroneous. It seems more likely, however, that the trial judge was of the view that since Smith had tendered his resignation, his employer was relieved of further responsibility under the Act and might thereafter accept it, even though the employee had by then relented in his resolve.

If this is the case, I must respectfully disagree.

In my opinion the language of the Act and the liberal construction of it by the Supreme Court and by our circuit supports the position of the Secretary here. · · ⸴

In *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir. 1977), we held that the protection of the Fair Labor Standards Act extended even to an employee after he had been voluntarily separated and protected him from retaliation when he sought employment elsewhere. After carefully reviewing the legislative history of the Act and noting that it "has been construed liberally to apply to the furthest reaches consistent with congressional direction," *Mitchell v. Lubin, McGaughy & Asso.*, 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959), Judge Phillips went on to quote from *Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). That quotation is equally applicable here:

> For weighty practical and other reasons, Congress did not seek to secure compliance with prescribed standards through continuing detailed federal supervision or inspection of payrolls. Rather it chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied. Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances. This end the prohibition of § 15(a)(3) against discharges and other discriminatory practices was designed to serve. For it needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions. Cf. *Holden v. Hardy*, 169 U.S. 366, 397, 18 S.Ct. 383, 390, 42 L.Ed. 780. By the proscription of retaliatory acts set forth in § 15(a)(3), and its enforcement in equity by the Secretary pursuant to § 17, Congress sought to foster a climate in which compliance with the substantive provisions of the Act would be enhanced.

361 U.S. at 292, 80 S.Ct. at 335, quoted in *Dunlop v. Carriage Carpet, supra*, 548 F.2d at 145.

As Judge Phillips made clear in *Dunlop v. Carriage Carpet*, the Fair Labor Standards Act was enacted as broad remedial legislation and its interpretation by the courts since then has been equally broad and liberal. I, therefore, do not believe it is possible to hold that Greene's conduct on August 7 was insulated from the reach of Section 15. That conduct could only be taken by Smith and every other employee of the bottling company for what it was: a retaliation against Smith for having filed his complaint and thus a clear warning that the resort by an employee to the statutory remedies provided by the Act carried with it the "calculated risk" of potential retaliatory discharge. *Mitchell v. DeMario Jewelry, supra*, 361 U.S. at 293, 80 S.Ct. 332. Accordingly, I would reverse the judgment of the district court and remand for entry of judgment for the Secretary.